IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD DIVISION

JAMES H. BARTLEY,                    )
          **Plaintiff,**           )
                                  )
v.                                   )          **CIVIL ACTION NO. 1:10-00706**
                                  )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
          **Defendant.**           )

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 - 433, 1381-1383f. By Standing Order entered May 4, 2010 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 12 and 15.), and Plaintiff's Reply. (Document No. 16.)

The Plaintiff, James H. Bartley, (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on May 2, 2007 (protective filing date), alleging disability as of January 31, 2006, due to severe COPD, chest pain, anxiety, and depression. (Tr. at 11, 83-85, 91-93, 114.) The claims were denied initially and upon reconsideration. (Tr. at 48-50, 53-55, 62-64, 65-67.) On February 28, 2008, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 68-69.) The hearing was held on April 15, 2009, before the Honorable Steven A. DeMonbreum. (Tr. at 22-43.) By decision dated June 3, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-21.) The ALJ's decision became the final decision of the Commissioner on March 17, 2010,

when the Appeals Council denied Claimant's request for review. (Tr. at 1-4.) Claimant filed the present action seeking judicial review of the administrative decision on May 4, 2010, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2009). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.

20 C.F.R. §§ 404.1520(f), 416.920(f) (2009). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and

3

extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, January 31, 2006. (Tr. at 13, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "chronic obstructive pulmonary disease (COPD), sleep apnea, hypertension, depression, and anxiety" which were severe impairments. (Tr. at 13, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 13, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light level work as follows:

> [C]laimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, he can lift/carry up to 20 pounds occasionally and ten pounds frequently; can stand and/or walk six or more hours in an eight hour day; can sit six or more hours in an eight hour day; should never climb ladders/ropes/scaffolds; and should avoid concentrated exposure to temperature extremes (extreme cold), dust, hazards (machinery, heights, etc), fumes, odors, chemicals, and gases. Additionally, due to mental impairment, the claimant would be limited to simple, repetitive work with minimal contact with the public.

(Tr. at 15, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 19, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a hand packer, packager, and assembler, at the light level of exertion. (Tr. at 19-20, Finding No. 10.)

5

On this basis, benefits were denied. (Tr. at 20, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on July 12, 1961, and was 47 years old at the time of the administrative hearing, April 15, 2009. (Tr. at 19, 26, 83, 91.) Claimant has a tenth grade, or limited, education. (Tr. at 19, Finding No. 8; 31-32, 119.) In the past, he worked as a truck driver. (Tr. at 19, Finding No. 6; 29, 39-40, 115-16.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and summarizes it below in relation to Claimant's arguments.

Physical Impairment Evidence:

### ***Princeton Community Hospital***:

Claimant presented to Princeton Community Hospital on April 25, 2007, for complaints of chest discomfort. (Tr. at 228-29.) A cardiolite stress test on that date revealed less than optimum stress test which showed no evidence of ischemia, no cardiac arrhythmia, and normal hemodynamic response to exercise. (Tr. at 212.) The myocardial perfusion scan was normal with an ejection fraction of fifty-seven percent. (Tr. at 211.) The x-rays of Claimant's chest on May 2, 2007, showed no acute cardiopulmonary disease, and his EKG was normal. (Tr. at 201-02.)

The radiology report of a chest x-ray, dated February 19, 2009, revealed that Claimant had no acute cardiopulmonary changes.

### ***Bluestone Health Center***:

Claimant treated at Bluestone Health Center from December 5, 2002, through May 29, 2007. (Tr. at 235-53.) On December 5, 2002, Claimant reported having injured his back two days prior when lifting 200 pound bags of salt and trying to squeeze between two structures, when he got stuck. (Tr. at 252.) He immediately experienced acute low back pain, and dropped the bags of salt. (Id.) He was seen at Raleigh General Hospital, where he was told that based on x-rays, but no MRI, he had some lumbar disk problems. (Id.) Claimant reported that he slept well at night, but that after four hours of sleep he awoke with throbbing, toothache-like, pain located in the right side of his lower back, which sometimes radiated down his leg. (Id.) He attempted to shovel snow the morning of his exam, but had to stop when he nearly wet his pants due to the severity of the pain. (Id.)

Dr. Bhullar, M.D., observed that Claimant was in no acute distress, had a normal gait and toe and heel walking, was able to squat and arise without assistance, and had negative straight leg raising bilaterally. (Tr. at 252.) Claimant had some pain on the right section of the trunk on rotation

to the right, had a positive Faber test bilaterally, and had tenderness on palpation of the right sacral region. (Id.) Dr. Bhullar assessed sacroiliac strain on the right, for which he prescribed Robaxin as needed and Naprosyn. (Id.) Claimant was advised to indulge in activities as tolerated with a one-week work excuse and no heavy lifting at work. (Id.) Dr. Bhullar also advised Claimant to follow a healthy diet. (Id.)

Claimant returned on July 16, 2003, and reported that he had been seeing Dr. Koja for his back problems. (Tr. at 253.) He complained of a urine infection. (Id.) Physical exam by Dr. Yadav, M.D., was unremarkable. (Id.) Dr. Yadav assessed dysuria, ordered a urinalysis, and advised Claimant to take Tylenol as needed for pain or fever. (Id.)

The next treatment note was on April 20, 2004, at which time Claimant complained of right ear pain. (Tr. at 251.) With the exception of factors related to his right otitis media and cerumen impaction in the right ear, Claimant's physical exam was unremarkable. (Id.) On January 19, 2006, Claimant walked in the clinic, complaining of a productive cough and shortness of breath. (Tr. at 250.) Claimant denied chest pain and physical exam revealed scattered rhonchi in the lungs. (Id.) Dr. Rana, M.D., assessed bronchitis for which he prescribed Amoxicillin 500mg and an Albuterol inhaler, scheduled a Spirometry, and advised Claimant to stop smoking. (Id.) Claimant returned on January 30, 2006, for a Spirometry, which revealed COPD, and Dr. Rana noted that he had active bronchitis. (Tr. at 244.) Dr. Rana continued him on the Albuterol and Advair. (Id.)

On February 6, 2006, Claimant complained of shortness of breath and wheezing, after having been exposed to cold air when he crawled under his house due to frozen water pipes. (Tr. at 243.) On exam, Dr. Yadav noted bilateral decreased air entry with scattered wheezing in the chest. (Id.) He assessed COPD exacerbation, for which he prescribed Kenalog 40mg, Albuterol/Atroven nebulization, and Prednisone. (Id.) Claimant was not interested in any particular intervention for

smoking cessation. (Id.)

Claimant returned to the clinic on April 19, 2007, complaining of a productive cough and chest pain, which subsided after 15 or 20 minutes. (Tr. at 241.) Dr. Rana noted that Claimant was completely pain free. (Id.) Physical exam revealed scatter rhonchi bilaterally and a normal EKG. (Id.) Dr. Rana assessed acute bronchitis with COPD, for which he prescribed Solu Cortef 100, as well as Albuterol, Advair, and Amoxicillin. (Id.) On April 30, Dr. Rana noted that Claimant continued to have shortness of breath and that his chest pain was better. (Tr. at 237.) He noted that Claimant had COPD, he advised that he stop smoking, and noted that his cardiolite stress test was normal. (Id.) On May 20, 2007, Dr. Rana gave Claimant a note that said he was under his care and was "unable to work for next 6 months." (Tr. at 236.) Claimant returned to Dr. Rana on May 29, 2007, for follow-up, at which time Claimant reported shortness of breath on mild to moderate exertion. (Tr. at 235.) He denied any chest pains and physical exam essentially was normal. (Id.) Dr. Rana assessed COPD and mildly elevated blood pressure. (Id.) He continued Claimant on the Albuterol, increased Advair to 500/50, and added a Spiriva HandiHaler. (Id.) Dr. Rana also encouraged a low sodium diet. (Id.)

### *Spirometry Testing*:

Spirometry testing, conducted on July 19, 2007, revealed that Claimant had mild airway obstruction with FEV 1 of 2.4 liter. (Tr. at 260-68.)

### *Dr. Withrow*:

On November 6, 2007, Dr. Curtis Withrow, M.D., reviewed all the medical evidence in the file and affirmed the July 27, 2007, physical RFC assessment, as written. (Tr. at 277.)

### *Dr. Patel*:

On October 3, 2007, Claimant was referred to Dr. Vishnu A. Patel, M.D., by Southern

Highlands, for possibility of sleep apnea. (Tr. at 328.) Claimant complained of restless sleeping, loud snoring and breathing stoppages per his girlfriend, frequent leg movements while sleeping, waking up feeling groggy and with a headache and dry mouth, excessive daytime sleepiness, and dozing off while watching television or driving. (Id.) Physical exam revealed decreased breath sounds bilaterally with a few thick wheezes. (Tr. at 329.) Polysomnography testing conducted on October 12, 2007, revealed that Claimant had obstructive sleep apnea syndrome with severe snoring noted throughout the study. (Tr. at 278-79.) His sleep efficiency was eighty-eight percent with a sleep onset latency of twenty-two minutes. (Tr. at 279.) The minimum oxygen saturation was seventy-nine percent. (Id.) Dr. Patel recommended that Claimant avoid sleeping in supine position, alcohol or sedatives prior to bed time, and work on weight reduction. (Id.)

Claimant followed-up with Dr. Patel on October 31, 2007, at which time he complained of continued dyspnea on exertion, a cough, and excessive daytime sleepiness. (Tr. at 327.) Dr. Patel noted that testing revealed "significant sleep apnea syndrome." (Id.) Dr. Patel assessed sleep apnea syndrome, asthma/COPD with bronchospasm, and anxiety and stress disorder. (Id.) Claimant chose the CPAP titration treatment. (Id.) On December 13, 2007, Claimant presented for a CPAP titration study follow-up, which revealed successful correction of sleep apnea. (Tr. at 326, 355.) Dr. Patel arranged for a CPAP mask at Claimant's home and advised that he continue his medication and weight reduction. (Id.) On March 12, 2008, Dr. Patel noted that Claimant overall, was doing well, with occasional dyspnea and cough. (Tr. at 324, 356.) Physical exam revealed bilateral decreased air entry without any wheezing or crackles. (Id.) Dr. Patel assessed asthma intrinsic, COPD, dyspnea, sleep apnea, and tobacco abuse. (Id.) He opined that Claimant may need pulmonary rehabilitation later on and that he should avoid exposure to extreme temperatures, chemicals, sprays, paints, or any strong odor. (Id.)

On May 8, 2008, Dr. Patel noted that Claimant had been using the CPAP machine every night with fairly good compliance and good response. (Tr. at 321, 358.) Claimant complained of feeling fatigued and of reflux symptoms. (Id.) Physical exam remained the same, as did the diagnoses, and Dr. Patel prescribed Chantix 1mg and Nexium 40mg. (Id.) On October 6, 2008, Jennifer Riffe, PA-C, opined in a general letter to whom it may concern, that Claimant "carries a diagnosis of Asthma, COPD, and Sleep Apnea. He requires his current medication and CPAP to have a standard of living." (Tr. at 320.)

Claimant returned to Dr. Patel on February 19, 2009, complaining of occasional dyspnea, a productive cough, feeling unrested in the morning with a headache, and loud snoring. (Tr. at 360.) Physical exam revealed bilateral decreased air entry without wheezing or crackles. (Id.) Dr. Patel assessed asthma intrinsic, COPD, and sleep apnea. (Id.) He prescribed Advair, Proventil HFA, and Spiriva, as well as sleep testing. (Tr. at 360-61.) Sleep study testing on February 25, 2009, revealed significant sleep apnea syndrome. (Tr. at 362-63, 365.) Pulmonary function testing on March 10, 2009, revealed moderate COPD with FEV 1 of 2.0 liters. (Tr. at 364.) On March 10, it was noted that Claimant was not using his CPAP therapy and was very anxious and nervous. (Tr. at 365.) Dr. Patel advised that Claimant continue his medications, stop smoking, and avoid the same environmental factors as before. (Id.) Dr. Patel again noted that he may require pulmonary rehabilitation later on. (Id.) Sleep study testing on March 17, 2009, revealed that oxygen was not used during the study, snoring was eliminated, that Claimant slept good, and did very well overall. (Tr. at 367-68.)

### *Dr. Lim - Physical RFC Assessment*:

On July 27, 2007, Dr. Rogelio Lim, M.D. completed a form physical Residual Functional Capacity Assessment, on which he opined that Claimant's atypical chest pain, COPD, anxiety, and

11

depression, limited him to performing work at the medium exertional level. (Tr. at 269-76.) He imposed environmental limitations, including avoiding concentrated exposure to temperature extremes and fumes, odors, dusts, gases, and poor ventilation. (Tr. at 273.)

Mental Impairment Evidence:

### *Dr. Riaz - Psychiatric Evaluation*:

On June 26, 2007, Dr. Riaz Uddin Riaz, M.D., a board certified psychiatrist, conducted a psychiatric evaluation of Claimant. (Tr. at 255-59.) Claimant reported that he was nervous, anxious, depressed, irritable, was easily upset, he cried easily, he liked to be left alone, and had anxiety attacks. (Tr. at 255.) Dr. Riaz noted that Claimant had difficulty in crowds of people, moderate psychomotor retardation, and appeared depressed, tremulous, and anxious. (Tr. at 256.) Claimant was sweaty and cried during the interview. (Id.) He reported five to six hours of sleep each night, a good appetite, and ability to care for his own person needs. (Tr. at 257.) He reported that he watched television and was able to drive, but did not read, visit friends and neighbors, attend church, or perform any hobbies. (Id.) On mental status exam, Claimant was depressed, nervous, and anxious. (Id.) He had no difficulty relating with Dr. Riaz and exhibited a depressed, irritable, and anxious mood with a constricted affect. (Id.) He reported that he felt worthless, hopeless, and useless all the time, and had suicidal thoughts, but no attempt. (Id.) Claimant was fully oriented, had no difficulty in abstract thinking, had good recent and remote memory, had fair attention and concentration, and his insight and judgment were present. (Id.) Dr. Riaz diagnosed major depressive disorder, severe, chronic; panic disorder; and assessed a GAF of 53. (Id.) Dr. Riaz opined that Claimant's prognosis was poor, and that his emotional and physical problems rendered "him incapable of gainful employment." (Tr. at 257-58.) Dr. Riaz further opined that Claimant was unable to interact appropriately with co-workers and supervisors, was unable to perform repetitive tasks at a sustained

12

level, and was not a suitable candidate for vocational rehabilitation. (Tr. at 258.) Nevertheless, he found that Claimant was capable of managing his own benefits. (Id.)

### ***Southern Highlands Community Mental Health Center, Inc.***:

Claimant treated at Southern Highlands from September 19, 2007, through May 28, 2008, on the referral of the West Virginia Division of Health and Human Resources. (Tr. at 304-19, 370-92.) Claimant appeared for his initial intake by Pamela J. Bailey, Mental Health Case Manager, on September 19, 2007. (Tr. at 317-19, 381-83.) Claimant reported that he was unable to work because his lungs were "too bad." (Tr. at 317, 381.) Ms. Bailey noted that Claimant's hygiene was fair and his grooming was poor. (Id.) Clinical impressions revealed that Claimant was fully oriented and had a depressed mood, good recent memory, poor remote memory per Claimant, low self concept, poor insight, and fair judgment. (Id.)

On October 17, 2007, Claimant underwent a psychiatric evaluation by Dr. Alina D. Vrinceanu-Hamm, M.D. (Tr. at 311-15, 388-92.) Claimant reported depression at a level eight or nine out of ten, loss of interest in activities he once enjoyed, varying sleep with multiple awakenings, and a twenty pound weight gain. (Tr. at 311, 388.) He also reported panic attacks with waking up at night. (Id.) He identified stressors to include having felt down over the quality of his life and his father's death on September 24. (Id.) Mental status exam revealed a depressed mood and constricted affect, goal directed and coherent speech and thought content, full orientation, good attention, fair insight and judgment, average intelligence, and that he related well. (Tr. at 314, 391.) Dr. Vrinceanu-Hamm diagnosed dysthymic disorder; major depressive disorder, recurrent, moderate; panic disorder without agoraphobia; and assessed a GAF of 55. (Id.) Prognosis was fair. (Id.)

Claimant returned to Southern Highlands on March 7, 2008. (Tr. at 305-08, 384-87.) Joseph White, Case Manager, noted that Claimant sought services due to panic attacks, anxiety, depression,

poor sleep and energy, and auditory hallucinations. (Tr. at 305-06, 384-85.) Mr. White noted that Claimant was fully oriented, displayed a fairly broad affect and mood, had passing suicidal thoughts, heard "white noise" on a daily basis; had poor remote and recent memories, and had fair insight and judgment. (Tr. at 307, 386.) He assessed panic disorder without agoraphobia, depressive disorder NOS, and assessed a GAF of 57. (Id.) Mr. White recommended psychological screening, clinical evaluations, and chemotherapy. (Tr. at 308, 387.)

Claimant underwent psychological screening on April 1, 2008. (Tr. at 377-80.) He reported a history of panic and anxiety since childhood. (Tr. at 377.) A review of systems revealed hypertension, COPD with sleep apnea, chronic heartburn, and bursitis in his shoulders. (Tr at 378.) Mental status exam revealed that Claimant had a moderately anxious mood with congruent affect, adequate speech, a preoccupation with health issues and possibly internal events, clear sensorium, and difficulties in remote recall. (Tr. at 379.) Claimant had occasional distractability with excessive response latency, he chose to self isolate, and it was noted that his insight and judgment were fair and his intelligence was average. (Tr. at 380.) He was diagnosed with panic disorder with agoraphobia, depressive disorder NOS, and was assessed with a GAF of 55. (Id.) His prognosis was guarded without individual therapy. (Id.)

Treatment notes from May 28, 2008, revealed the same diagnoses. (Tr. at 374.) On mental status exam, Claimant maintained direct eye contact , interacted well, exhibited a neutral mood and anxious affect, had appropriate speech and good appetite, reported poor energy and inadequate sleep, and had normal stream of thought and appropriate content of thought. (Id.) He also had good insight, judgment, and memory, and was fully oriented. (Id.)

### *Tonya M. McFadden, M.A. - Consultative Examination*:

Claimant underwent a consultative examination by Tonya M. McFadden, M.A., a licensed

14

psychologist, on January 2, 2008. (Tr. at 280-85.) Ms. McFadden observed that Claimant was able to move about and walk without any disturbances in gait. (Tr. at 280.) Claimant reported that he was depressed and described his mood as "real bad" since the death of his father. (Tr. at 281.) He related that his sleep varies with his feelings of agitation, he had poor energy levels at times, he felt anxious at other times, he was fatigued from worrying and experienced headaches, he felt tense and restless from worry, he had difficulty trusting others and felt paranoid that people were out to get him. (Id.) Claimant also reported that he was highly suspicious of foreign people and terrorists, mistrusted doctors, and feared contracting diseases from mosquitoes and bird flu from terrorists. (Id.) He stated that he hyperventilated when he had panic attacks and felt particularly nervous in crowds because he worried about contracting diseases. (Id.) Finally, Claimant reported that he had poor concentration and memory, decreased interest in activities he once enjoyed, increased appetite and an associated 25 pound weight gain over the past couple years, and felt worthless. (Tr. at 282.)

On mental status exam, Claimant presented with an anxious mood, a blunted affect, normal thought process and speech, fair insight, and normal judgment. (Tr. at 283.) Ms. McFadden noted that Claimant was "highly suspicious[,]"his immediate and remote memory was intact, his recent memory was moderately deficient, his psychomotor behavior was normal, and his concentration, persistence, and pace were normal. (Id.) She further noted however, that Claimant's social functioning during the interview was moderately deficient. (Id.) Ms. McFadden observed that Claimant seemed uncomfortable in the social situation, he offered infrequent eye contact, he appeared jump, and he was distant and standoffish. (Id.) Claimant reported his daily activities to have included watches the news on television all day, eating dinner with his girlfriend, caring for his own personal needs, preparing meals one to two times a week, and running the vacuum cleaner once a month. (Id.)

15

Ms. McFadden diagnosed generalized anxiety disorder, panic disorder with agoraphobia, and depressive disorder NOS. (Tr. at 284.) She opined that Claimant's prognosis was guarded but that he was able to manage his finances. (Id.)

### Dr. Saar - Psychiatric Review Technique & Mental RFC Assessment:

On January 7, 2008, Dr. Timothy Saar, Ph.D., completed a form Psychiatric Review Technique ("PRT") and a Mental Residual Functional Capacity Assessment. (Tr. at 286-99, 300-03.) On the PRT, Dr. Saar opined that Claimant's depression disorder NOS and generalized anxiety disorder resulted in no restrictions in his activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (Tr. at 286, 289, 291, 296.) He opined that Claimant had not experienced any episodes of decompensation of extended duration. (Tr. at 296.) On the form Mental RFC Assessment, Dr. Saar opined that Claimant was moderately limited in his ability to understand, remember, and carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; and respond appropriately to changes in the work setting. (Tr. at 300-01.) Dr. Saar noted that the evidence did not support any severe limitations in Claimant's mental functional capacity, and therefore, that Claimant could "learn and perform a variety of repetitive work-like activities that involve minimal public contact." (Tr. at 302.)

### Ms. Jennings - Psychological Evaluation:

Elizabeth Jennings, M.A., conducted a psychological evaluation of Claimant on November 3, 2008, at the request of the West Virginia Department of Health and Human Resources. (Tr. at 337-41.) Claimant reported that he was depressed and anxious, that he experienced crying spells, that he slept poorly, that he experienced panic attacks, and that he could not stand to be around crowds of people. (Tr. at 337.) On mental status exam, Ms. Jennings observed that Claimant was

16

dressed in soiled jeans with a ball cap pulled down over his eyes. (Tr. at 338.) Claimant was

cooperative, his psychomotor behavior was mildly slowed, he made intermittent eye contact, and

he appeared mildly distracted during the evaluation. (Id.) Claimant was fully oriented, his mood was

dysphoric and his affect was restricted, his insight and judgment were mildly deficient, his

immediate and remote memory was mildly deficient, and his recent memory was within normal

limits. (Tr. at 338-39.) Claimant's concentration was normal and his social functioning was mildly

deficient. (Tr. at 339.) The Beck Depression and Anxiety Inventory revealed severe symptoms of

depression and anxiety. (Id.) Ms. Jennings diagnosed major depressive disorder, recurrent, moderate;

panic disorder without agoraphobia; and assessed a GAF of between 55 and 60. (Id.) Ms. Jennings

opined that Claimant's prognosis was guarded "with available medical and mental health treatment."

(Tr. at 340.) She noted that Claimant's depression and anxiety symptoms would benefit from referral

for a psychiatric evaluation to assist with the symptoms and for individual therapy. (Id.) Ms.

Jennings opined that Claimant's

> psychiatric symptoms are currently not stabilized and medical conditions were noted
> to keep him from working. Additional stress is likely to result in decompensation due
> to the combination of physical and mental health issues. In his present condition, it
> is not felt that he would be able to hold gainful employment.

(Tr. at 340.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence

because the ALJ improperly assessed Claimant's mental residual functional capacity when he failed

to include limitations in interacting appropriately with coworkers and supervisors and his inability

to do repetitive tasks on a sustained level, as stated in the opinions of Dr. Riaz and Ms. Jennings.

(Document No. 12 at 8-11.) Claimant asserts that contrary to the ALJ's decision, Dr. Riaz's and Ms.

Jennings's opinions were consistent with the evidence of record, including their examinations of

Claimant and the reports of Ms. McFadden and Southern Highlands. (Id. at 10-11.)

In response, the Commissioner asserts that the ALJ reasonably gave the opinions of Dr. Riaz and Ms. Jennings little weight because their conclusions neither were consistent with the record as a whole, nor with their evaluations. (Document No. 15 at 11-12.) The Commissioner asserts that although they both reach the same conclusion to support Claimant's eligibility for a medical assistance card, their opinions were internally inconsistent as their GAF scores were only consistent with moderate limitations, as opposed to marked limitations. (Id. at 11.) Furthermore, the Commissioner asserts that their mental status exams revealed only mild deficiencies in social functioning and memory deficits and normal to fair concentration. (Id.) Finally, the Commissioner notes that despite Dr. Riaz's opinion that Claimant could not interact appropriately with coworkers, Claimant did not make such an allegation and he reported only that he was a long-standing loner. (Id. at 12.) Similarly, though Ms. Jennings opined that additional stress would result in Claimant's decompensation, Claimant's work and treatment history did not support her opinion. (Id.)

In Reply, Claimant argues that the Commissioner suggested that the opinions of Dr. Riaz and Ms. Jennings were given little weight because they "took an advocate role without a longitudinal perspective of his overall status." (Document No. 16 at 1-2.) Claimant asserts, however, that the ALJ did not make such a statement in his decision. (Id. at 2.) Furthermore, Claimant argues that the Commissioner made inconsistent arguments as to how the two reports should have been interpreted. (Id.) He notes that, on the one hand, the Commissioner argued that the opinions should be discredited because they credited Claimant's subjective complaints. (Id.) However, on the other hand, the Commissioner faulted Dr. Riaz for finding that Claimant could not interact appropriately with coworkers because Claimant did not state that. (Id.) Finally, Claimant asserts that the Commissioner inappropriately argued that if Claimant's mental impairments alone were

insufficiently severe to be disabling, then the effects of those mental impairments cannot be considered in combination with his physical impairments. (Id. at 2-3.)

Claimant next alleges that even if the ALJ's residual functional capacity assessment was supported by substantial evidence, the ALJ erred when he failed to present all of Claimant's mental limitations to the VE. (Document No. 12 at 11-14.) Claimant asserts that the ALJ failed to include the need for only simple work in his hypothetical questions to the VE. (Id. at 12.) Claimant asserts that a review of the jobs identified by the VE, those of hand packer, packager, and small parts assembler, demonstrates that the only job listed as light in the Dictionary of Occupational Titles ("DOT") is not limited to simple tasks. (Id.) He notes that there are no light packager jobs in the DOT, and that the small parts assembler job has a reasoning level of two, which requires more than simple tasks. (Id. at 12-13)

The Commissioner asserts in response that Claimant inaccurately asserted that there were no light packaging jobs. (Document No. 15 at 13.) The Commissioner notes that the DOT identifies a bottling-line attendant as a packer, DOT number 920.687-042, which requires light exertion with a SVP rating of 1. (Id. at 14-15.) Though the ALJ inadvertently stated that light work required lifting up to 25 pounds occasionally, the Commissioner asserts that considering the full text of the decision and the testimony reveals that all limitations were included. (Id. at 14.) The Commissioner further asserts that Claimant essentially challenges the ALJ's use of "unskilled" work in the hypothetical questions instead of "simple" work. (Id.) The Commissioner asserts that by regulatory definition, 20 C.F.R. §§ 404.1568, 416.968, simple tasks and unskilled work are synonymous. (Id.)

In Reply, Claimant asserts that because the ALJ failed to include limitations in interacting appropriately with co-workers and supervisors and his inability to do repetitive tasks on a sustained level as reported by Dr. Riaz, there is no substantial evidence to support the ALJ's conclusion that

jobs existed in significant numbers in the national economy. (Document No. 16 at 3.)

Analysis.

1. Medical Source Opinions.

Claimant first alleges that the ALJ erred in giving little weight to the opinions of Dr. Riaz and Ms. Jennings. At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2009). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2009).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2009). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the

other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2009). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants.

22

20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2009). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2009). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2009). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2009). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

The ALJ reviewed the opinions of Dr. Riaz and Ms. Jennings and concluded that their opinions were entitled little weight because their opinions were inconsistent with the record as a whole and with their own evaluations. (Tr. at 18.) The ALJ acknowledged Dr. Riaz's opinion that Claimant was unable to interact appropriately with co-workers and supervisors and was unable to

23

perform repetitive tasks at a sustained level. (Tr. at 17.) Nevertheless, during Dr. Riaz's mental status exam, he noted that Claimant had no trouble relating with him, that his concentration was fair, that he was able to name the current and four previous Presidents, he was able to do four of four steps of the Serials 7's, and he was able to repeat six digits forward and three digits backward. (Tr. at 18.) The ALJ concluded that this supported an ability to do simple tasks and relate adequately. (Id.) The ALJ also acknowledged Ms. Jennings's opinion that Claimant was unable to sustain gainful employment. (Tr. at 18.) Nevertheless, the ALJ noted that during her mental status exam, she found that Claimant's concentration was normal, that he completed serial 3's and 7's, that he could spell the word "world" forward and backward, and that his social functioning was only mildly impaired. (Id.)

The ALJ gave greater weight to the opinion of the state agency reviewing medical source, Dr. Timothy Saar, M.D., because his conclusions were consistent with the objective record and Claimant's daily activities. (Tr. at 18.) The ALJ noted that Claimant's concentration was only mildly to moderately impaired during the various evaluations. (Tr. at 18-19.) The ALJ determined however, that due to Claimant's lack of social activities and preference to be alone, he "obviously has some difficulty interacting." (Tr. at 19.) The ALJ therefore, limited Claimant to simple, repetitive work with minimal contact with the public. (Tr. at 15.)

The undersigned finds that the ALJ's decision to give little weight to the opinions of Dr. Riaz and Ms. Jennings is supported by substantial evidence. As the ALJ found, Claimant's concentration was only mildly or fairly to moderately impaired and he interacted well during all his examinations. Despite Claimant's challenge to the Commissioner's assertion, the undersigned notes that Claimant never complained of difficulty interacting with co-workers and supervisors. Rather, he only reported that he preferred to be alone, became uneasy when there were a "bunch of people around," and on at least one occasion, that he was suspicious of others. He also reported that he got along well with

24

his girlfriend and they ate dinner together. Beyond the opinions of Dr. Riaz and Ms. Jennings, nothing in the record suggested that Claimant was unable to interact with co-workers and supervisors. To the extent that Claimant preferred to be left alone, the ALJ limited him to minimal contact with the public. Furthermore, there was nothing in the record to suggest that Claimant was unable to perform routine, repetitive tasks, due to mental impairments. Mental status examinations revealed nothing grossly abnormal, and there was no evidence of Claimant's inability to perform repetitive activities. The little evidence of record indicated that Claimant could perform serial 3's and 7's, had normal pace, primarily normal memory, and was able to repeat things. Though these alone do not suggest the ability to repetitive activities, there is an absence of evidence to the contrary. Accordingly, based on the foregoing, the undersigned finds that the ALJ's decision to give little weight to the opinions of Dr. Riaz and Ms. Jennings is supported by substantial evidence.

2. Hypothetical Questions.

Finally, Claimant alleges that the ALJ erred when he failed to include all of Claimant's limitations in the hypothetical questions posed to the VE. To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See

Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

    In the ALJ's hypothetical questions to the VE, he included all of Claimant's impairments that were supported by the record. (Tr. at 40-42.) Though the ALJ did inadvertently include an occasional lifting limit of 25 pounds and a frequent limit of 10 pounds, it is clear from his decision that he limited Claimant to light exertion with an occasional lifting limit of 20 pounds and a frequent lifting limit of ten pounds. (Tr. at 15, 41.) The ALJ asked the VE to consider a person limited to only repetitive work that involved little public contact and was unskilled. (Tr. at 40-41.) The VE identified the jobs of a hand packer, which was at the light exertional level and a SVP of two, and a small parts assembler, also at the light exertional level. As the Commissioner points out, the job of a bottling-line attendant, which is a packer position, requires only light exertion with a SVP rating of 1. Consequently, regardless of any difference between the terms unskilled and simple tasks, it is clear that this job falls within those jobs identified by the VE. Nevertheless, by regulatory definition, it is clear that unskilled work encompasses "simple" duties that are capable of being learned in a short period of time. Furthermore, the limitations imposed by Dr. Riaz and Ms. Jennings are unsupported by the record, as discussed above. The  ALJ was not required to include such limitations in his hypothetical questions. Accordingly, based on the foregoing, the undersigned finds that the ALJ's reliance on the VE's testimony and his decision that other jobs existed in significant numbers in the national economy is supported by substantial evidence.

    For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 12.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 15.), **AFFIRM** the final decision of the

Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Senior Judge Faber, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 18, 2011.

R. Clarke VanDervort
United States Magistrate Judge

27